UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| VIOLA S. JONES, | } |
| | } |
| Plaintiff, | } |
| | } |
| v. | } Case No.: 1:23-cv-01756-RDP |
| | } |
| FRANK BISIGNANO, COMMISSIONER | } |
| OF SOCIAL SECURITY,[1] | } |
| | } |
| Defendant. | } |

## MEMORANDUM OPINION

Before the court is Defendant Frank Bisignano's Motion for Summary Judgment. (Doc. # 36). The Motion has been fully briefed. (Docs. # 36, 44, 48). After careful review, and for the reasons discussed below, the Motion is due to be granted.

**I.      Background[2]**

Plaintiff Viola Jones ("Plaintiff") was hired by the Social Security Administration ("SSA") in March 2015 as a "Schedule A" full-time Customer Services Representative at the Birmingham Downtown Field SSA Office. (Docs. # 35-1 at 12:10-12; # 35-2 at 40-41). As a Grade 7, Step 1 employee, Plaintiff's starting salary was $39,570.00. (Doc. # 35-2 at 40-41).

From her hiring in March 2015 through December 2015, Plaintiff used a total of 126.75 hours of unpaid leave. (Doc. # 35-6 ¶ 15). This included 95.50 hours of general leave without pay

---

[1] On May 7, 2025, Frank Bisignano became the Commissioner of the Social Security Administration. Pursuant to Federal Rule of Civil Procedure 25(d), the court substitutes Commissioner Bisignano as the defendant in the action. *See* Fed R. Civ. P. 25(d) (Although the public officer's "successor is automatically substituted as a party when the predecessor no longer holds office, the "court may order substitution at any time . . . .").

[2] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

("LWOP") and 31.25 hours of LWOP under the Family and Medical Leave Act ("FMLA").[3] (*Id.*). By the end of 2016, Plaintiff had taken 9 hours of advanced annual leave and 11.75 hours of advanced sick leave and had used 416 hours of general LWOP.[4] (*Id.* ¶¶ 16-17).

In 2017, Plaintiff's annual within-grade increase ("WIGI") was delayed due to excessive leave without pay. (*Id.* ¶ 18). By the end of 2017, Plaintiff had taken 25.25 hours of advanced sick leave and a total of 329.50 hours of unpaid leave, consisting of 147.50 hours of general LWOP and 182 hours of LWOP under the Family and Medical Leave Act ("FMLA"). (*Id.* ¶¶ 19-20). In 2018, Plaintiff's WIGI was again delayed due to excessive leave without pay. (*Id.* ¶ 22).

In 2018, Plaintiff requested a hardship transfer to the Talladega Field SSA Office due to her mother's illness. (Doc. # 35-1 at 12:13-15:10). SSA approved her request, and Plaintiff moved to the Talladega Field SSA Office in 2019. (*Id.*). Plaintiff's direct supervisor in the Talladega Field SSA Office was Carolyn Rowls. (*Id.* at 64:11-14). By the end of 2018, Plaintiff had taken 67.5 hours of advanced sick leave and a total of 487.50 hours of unpaid leave, consisting of 303.50 hours of general LWOP and 184 hours of LWOP under the FMLA. (Doc. # 35-6 at ¶¶ 23-24). By the end of 2019, Plaintiff had taken 48.75 hours of advanced sick leave and 208 hours of general LWOP. (*Id.* ¶¶ 25-26).

In November 2020, Plaintiff had knee replacement surgery. (Doc. #35-1 at 33:24-34:2). Before her surgery, Plaintiff had not taken any LWOP in 2020. (Doc. # 35-6 ¶ 29). Plaintiff applied for FMLA leave for her knee replacement, and Plaintiff's doctor estimated that she would be unable to work from November 18, 2020 until February 18, 2021. (Doc. # 35-1 at 38:8-16; # 35-6

---

[3] The court notes that FMLA leave is only available to eligible employees who have "completed at least 12 months of service as an employee . . . of the Government of the United States." 5 U.S.C. § 6381. However, SSA policy allows employees to use FMLA paid leave "when the employee has accrued paid leave of any kind." (Doc. # 35-6 ¶ 13).

[4] Advanced leave permits employees to receive pay for time off even when they have not yet accrued sufficient leave, provided they later repay the advanced time. (*See* Doc. # 35-1 at 54:6-24; 35-6 ¶ 12).

2

¶ 27; # 35-7 at 3). By the end of 2020, Plaintiff had taken 7.27 hours of advanced sick leave and 194 hours of LWOP under the FMLA. (Doc. # 35-6 ¶ 30-31). And between November 18, 2020 and February 18, 2021, Plaintiff used 394 hours of LWOP under the FMLA. (*Id.* ¶ 32).

In January 2021, Plaintiff inquired into the Federal Employees Retirement System Disability Retirement program at her doctor's recommendation. (Doc. # 35-1 at 74:12-21; # 35-3). Plaintiff applied for disability benefits through SSA but "couldn't go any further" in the process because she did not have a denial letter, which was only available for those working 80 hours per pay period. (Doc. # 35-1 at 77:11-78:9).

On February 18, 2021, Plaintiff's doctor estimated that Plaintiff would remain unable to work until March 15, 2021. (Doc. # 35-6 ¶ 34). But by March 9, 2021, Plaintiff had used all 480 hours of leave permitted by the FMLA. (*Id.* ¶ 35).

In a doctor's note dated March 9, 2021, Plaintiff's doctor indicated that Plaintiff was cleared to return to work on March 15, 2021. (Doc. # 35-15). When SSA received the note on March 11, 2021, Plaintiff and Rowls, her supervisor, had a conversation about Plaintiff returning to work on March 15. (Doc. # 35-1 at 67:1-5). During the conversation, Rowls told Plaintiff that her computer needed to be rebooted and updated at the field office before Plaintiff could resume working. (*Id.* at 69:1-25). Plaintiff took her computer to the office to be updated. (*Id.* 69:1-70:7).

The Talladega Field Office later received another doctor's note dated March 11, 2021 from a different provider explaining that Plaintiff "continues to take narcotic pain medication, muscle relaxants, and medication for neuropathy, which makes her drowsy. [Plaintiff] is restricted from working while taking the above medications." (Doc. # 35-16). After receiving this note, Rowls's supervisor told Rowls that Plaintiff was not in a condition to return to work. (Doc. # 35-1 at 70:15-71:7).

3

On April 23, 2021, Rowls sent Plaintiff a "Notice to Return to Duty." (Doc. # 35-9). The Notice stated that Plaintiff was "directed to return to work on a regular and continuing basis no later than May 12, 2021." (*Id.* at 1). The Notice provided that Plaintiff's "[f]ailure to do so will result in the agency taking appropriate actions up to and including removal from Federal Service." (*Id.* at 2).

On May 7, 2021, Plaintiff submitted a request for a Reasonable Accommodation ("RA") to transfer back to the Birmingham Downtown Field SSA Office. (Doc. # 40-4 at 32). On May 11, 2021, Rowls sent Plaintiff a memorandum on behalf of SSA explaining that additional medical documentation was required to show how Plaintiff's conditions related to her accommodation request. (*Id.*). The memorandum set a submission deadline of June 10, 2021. (*Id.* at 33). On May 13, 2021, Rowls's supervisor, acting on Rowls's behalf, sent Plaintiff an amended request for supporting medical documentation, and extended the deadline to June 12, 2021. (*Id.* at 36-37).

On July 12, 2021, Rowls sent Plaintiff another memorandum stating that her RA request remained pending. (Doc. # 40-5 at 7). The memorandum explained that, based on the medical documentation submitted, SSA determined the information was insufficient to establish Plaintiff as an employee with a disability. (*Id.*). Plaintiff was given a third opportunity to submit medical documentation by August 12, 2021. (*Id.* at 9).

On August 5, 2021, Rowls sent Plaintiff a Notice of Proposed Removal ("PR Notice"). (Doc. # 35-10). The PR Notice charged Plaintiff with excessive absences, explaining that Plaintiff had been absent from work since November 18, 2020 and that there was "no indication that [Plaintiff would] be able to return to regular and consistent . . . work in the foreseeable future." (*Id.* at 1-2). Rowls calculated that since November 18, 2020 through the date of the PR Notice,

Plaintiff had taken 934.25 hours of LWOP and other approved leave, not including the 480 hours of LWOP Plaintiff utilized under the FMLA. (*Id.* at 1; *see also* Doc. # 35-6 ¶¶ 35-39).

On August 12, 2021, Plaintiff resigned from her position. (Doc. # 35-11). In her resignation letter, Plaintiff explained that she resigned "due to several health issues" and that "[i]t wasn't [her] plan to resign," but she felt like she had "no other choice." (*Id.*). When asked about her resignation in her deposition, Plaintiff stated that she resigned because she "received a letter saying that [she] was going to be removed and [she] didn't want that on [her] record." (Doc. # 35-1 at 89:15-90:1). On December 13, 2021, SSA issued a Request for Bill for Collection for Plaintiff's advanced leave totaling $ 4,033.58. (Doc. # 35-12).

Plaintiff did not apply for employment from the time of her resignation until May 2024, after she filed this case. (Doc. # 35-1 at 100:22-101:17, 11:24-112:4). She has not applied for any jobs outside of the federal government. (*Id.* at 101:12-14).

As of June 5, 2025, Plaintiff was receiving disability insurance benefits ("DIB"). (*Id.* at 110:1-18). She began receiving DIB in August 2022. (*Id.* at 106:13-16). Her DIB payments were also backdated six months. (*Id.* at 110:1-18). She continues to take prescription pain medication as needed for her knee pain. (*Id.* at 45:12-46:16).

## II.     Procedural History

On June 1, 2021, Plaintiff filed a formal Equal Employment Opportunity ("EEO") Complaint for Discrimination. (Doc. # 35-4). Plaintiff's complaint alleged discrimination against Rowls based on "physical disability, reprisal, [and] mental [disability]," specifically because of the Notice to Return to Duty she received on April 23, 2021. (*Id.* at 3). After review by an Equal Employment Opportunity Commission ("EEOC") Administrative Judge ("AJ"), on May 24, 2022, the AJ found that Plaintiff did not establish she was subjected to discrimination. (Doc. # 1-1 at 2).

On June 16, 2022, Plaintiff filed an appeal with the EEOC from the AJ's final order. (*Id.* at 1). On September 27, 2023, the EEOC affirmed the AJ's final order. (*Id.* at 1-5).

## III.   Legal Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of a material fact. *See id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could [find] for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

"[A]t the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a

6

sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1381 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment."). Also, these are the facts for summary judgment purposes only; they may not be the actual facts. *See Cox v. Admin. U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'What we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [] may not be the actual facts.'") (citations omitted).

## IV.   Discussion

On December 27, 2023, Plaintiff filed her *pro se* Complaint for employment discrimination in this court. (Doc. # 1).[5] Her complaint stated that the action was brought for discrimination in employment pursuant to the Americans with Disabilities Act and "Other federal law: Retaliation." (*Id.* at 3). Plaintiff's ADA claim was dismissed with prejudice at the motion to dismiss stage because ADA claims are not cognizable against the federal government. (Doc. # 15). As pled, Plaintiff's remaining claim for retaliation falls under the Rehabilitation Act. (*See* Doc. # 1 at 3). In an attempt to liberally construe Plaintiff's pleadings, *Erickson*, 551 U.S. at 94, the court also evaluates Plaintiff's retaliation claim under the FMLA. The court addresses Plaintiff's retaliation claims below.

### A.   Plaintiff's Retaliation Claim Under the Rehabilitation Act

The Rehabilitation Act incorporates the anti-retaliation provision from § 12203(a) of the ADA. 29 U.S.C. § 791(f). "The ADA's anti-retaliation provision is similar to Title VII's anti-

---

[5] Plaintiff is proceeding *pro se* and used a form complaint in filing this action. (*See* Doc. # 1). It is well settled that a document filed *pro se* is "to be liberally construed . . . and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)) (internal quotations omitted).

7

retaliation provision, and the same analysis is used for both. Therefore, we assess retaliation claims under the Rehabilitation Act using the same framework as Title VII retaliation claims." *Solloway v. Clayton*, 738 F. App'x 985, 988 (11th Cir. 2018) (citing *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997); *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).

To establish a *prima facie* case of retaliation under Title VII, "a plaintiff must prove the following elements: (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment action." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000).

### 1. Plaintiff participated in a protected activity

An employee satisfies the protected activity element of a retaliation claim if she (1) has opposed any practice made an unlawful employment practice by the Rehabilitation Act or (2) has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the Rehabilitation Act. This is the same standard that is applied in the Title VII framework. *See* 42 U.S.C. § 2000e-3(a).

In her response to Defendant's Motion for Summary Judgment, Plaintiff first asserts that she engaged in protected activity by filing a formal EEO complaint of disability discrimination on May 21, 2021. (Doc. # 35-4 at 7). Filing a formal EEO complaint clearly is a protected activity. *See* 42 U.S.C. § 2000e-3(a).

Plaintiff also suggests that her other protected activity consisted of submitting medical doctor excuses. (Doc. # 35-4 at 10). But, submitting medical doctor excuses does not constitute protected activity because it neither opposes an unlawful employment practice nor involves participation in a Title VII investigation, proceeding, or hearing. *See* 42 U.S.C. § 2000e-3(a).

8

### 2. Plaintiff did not suffer an adverse employment action

An adverse employment action is an action that "produces an injury or harm" and would dissuade a reasonable worker from engaging in protected conduct. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006). Under Title VII, and by extension here the Rehabilitation Act, only an adverse employment action that occurs after protected activity is actionable. *See* 42 U.S.C. § 2000e-3(a).

#### a. Notice to Return to Duty

Plaintiff does not dispute that the alleged retaliation is based on the following action: "On April 26, 2021, management issued [Plaintiff] a Notice to Return to Duty . . . ." (Doc. # 36 ¶ 64, *see* Doc. # 44 at 2 ("Numbers 37 thru 64: Undisputed")). Plaintiff filed her formal EEO complaint on May 21, 2021, after receiving the Notice to Return to Duty on April 26, 2021. (*Compare* Doc. # 35-4 *with* Doc. # 35-9.). Because the alleged protected activity, the formal EEO complaint, was filed after Plaintiff received the Notice to Return to Duty, the Notice to Return to Duty cannot be an adverse employment action taken in retaliation for filing the EEO complaint. *See* 42 U.S.C. § 2000e-3(a).

#### b. Notice of Proposed Removal

Plaintiff also argues that she suffered an adverse employment action in the form of the August 2021 Notice of Proposed Removal ("PR Notice") (Doc. # 44 at 3).

Before filing a discrimination lawsuit in federal court, a federal employee must first seek relief from the agency where the alleged discrimination occurred. *See* 29 U.S.C. § 794a(a)(1); 42 U.S.C. § 2000e-16(b)-(c); 29 C.F.R. §§ 1614.105(a)(1), 1614.407; *Love v. Pullman*, 404 U.S. 522, 523 (1972); *Jimenez v. U.S. Att'y Gen..*, 146 F.4th 972, 988-89 (11th Cir. 2025). That is, such an employee must first consult with an officer in her employing agency's EEO office within forty-five days of the alleged discriminatory event. 29 C.F.R. § 1614.105(a)(1); *Shiver v. Chertoff*, 549

F.3d 1342, 1344 (11th Cir. 2008). The plaintiff bears the burden of demonstrating that she exhausted her administrative remedies. *Jackson v. Seaboard Coast Line R.R.*, 768 F.2d 992, 1010 (11th Cir. 1982); *Reed v. Winn Dixie, Inc.*, 677 F. App'x 607, 610 (11th Cir. 2017).

Here, Plaintiff raised two claims before the EEOC: (1) disability discrimination and (2) retaliation. (See # Doc. 1-1 at 1). The sole factual basis identified in support of the retaliation claim was that "[o]n April 26, 2021, management issued [Plaintiff] a Notice to Return to Duty . . . ." (Doc. # 36 ¶ 64). Plaintiff did not allege retaliation based on the August 2021 PR Notice in her EEO complaint (*see* Doc. # 36-4) or in her complaint in this action (*see* Doc. # 1). Although Plaintiff had the right to amend her EEO charge to include this alleged adverse employment action, she did not do so. *See* 29 CFR § 1601.12 ("A charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein."). Because Plaintiff failed to raise the August 2021 PR Notice as a basis for retaliation during the administrative process, she did not exhaust her administrative remedies as to that claim. *Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 589 n.8 (11th Cir. 1994) ("[A] plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." (citing *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir. 1970))).

Even if the court found that Plaintiff did exhaust her administrative remedies as to the August 2021 PR Notice, the PR Notice was not an adverse employment action because it did not "produce[] an injury or harm" to Plaintiff or dissuade her from engaging in protected conduct. *See Burlington*, 548 U.S. at 67-68. The PR Notice informed Plaintiff that her supervisor was *proposing* to remove her from her position because of her excessive absences. (Doc. # 35-10 at 1). It explained that Plaintiff had been absent from work since November 18, 2020 and that Plaintiff used 934.25

hours of LWOP and other leave since that date, excluding her 480 hours of FMLA leave. (*Id.*). It also gave Plaintiff notice of her rights in light of the proposal:

> This notice is a *proposal* and *not a decision*. The final decision whether or not to remove you from the Agency and from Federal service will be made by the deciding official . . . . In arriving at her decision, she will consider this proposal, all of the evidence relied upon to support the proposal, any reply that you make, and all of the relevant aggravating and mitigating factors. You will be notified of the decision in writing, after receipt of your response. If you do not respond, you will receive the written decision after the expiration of the reply period.
>
> *You have the right to respond* orally, in writing, or both. . . . You, your designated representative or both of you may make the oral presentation at the arranged time. *You may submit affidavits and/or other documentary evidence* in support of your response.
>
> . . .
>
> *You have the right to be represented* by an AFGE representative, an attorney or other union-approved representative that you have designated in writing. . . . *You and your representative have the right to review the material relied upon to support the proposed removal*. If you and your representative wish to review the material, you may direct your request to me, the proposing official.

(*Id.* at 5-10) (emphasis added). But, before the deciding officer could render a decision on the proposal, and instead of exercising the rights explained in her PR Notice, Plaintiff resigned. (Doc. # 35-11). Other district courts in this Circuit have held that a Notice of Proposed Removal is not an adverse employment action. *See, e.g.*, *Solloway v. White*, No. 1:13-cv-03827-TWT-WEJ, 2017 WL 1170895, at *31 (N.D. Ga. Feb. 15, 2017) (holding that "service of a Notice of Proposed Removal is not a materially adverse action"). In this case, the court agrees.

### c. Constructive Discharge

Finally, Plaintiff argues that she suffered an adverse employment action in the form of constructive discharge when she resigned on August 12, 2021. (Doc. # 44 at 3). Under Title VII, a constructive discharge is tantamount to an actual discharge, so it constitutes an adverse employment action. *Green v. Brennan*, 578 U.S. 547, 555, 560 (2016) ("The whole point of allowing an employee to claim 'constructive' discharge is that in circumstances of discrimination

11

so intolerable that a reasonable person would resign, we treat the employee's resignation as though the employer actually fired him."); *Akins v. Fulton Cnty.*, 420 F.3d 1293, 1300-01 (11th Cir. 2005) ("Constructive discharge negatively affects an employee's job status, and therefore constitutes an adverse employment action."). Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thus forces her to quit her job. *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009). A constructive discharge claim has "two basic elements: discrimination and discharge." *Green*, 578 U.S. at 555-56.

Here, Plaintiff claims that she was constructively discharged because (1) "the agency refused to make reasonable accommodations for her disabilities" by (a) "transferring her back to the Birmingham, AL SSA office" or (b) "granting her extended FMLA leave time," and (2) "she did not want that [termination/discharge] on her record." (Doc. # 44 at 4; Doc. # 36 ¶¶ 48-49; Doc. # 35-1 at 89:15-24).

"The Rehabilitation Act does not require employers to speculate about their employees' accommodation needs." *Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1333 (11th Cir. 2022) (citation modified); *see* 29 U.S.C. § 794(a). Instead, "to trigger an employer's duty to provide a reasonable accommodation, the employee must (1) make a specific demand for an accommodation and (2) demonstrate that such accommodation is reasonable." *Owens*, 52 F.4th at 1333. "Only after the employee provides this information must the employer 'initiate an informal, interactive process' with the employee." *Id.*

Plaintiff submitted a request for a Reasonable Accommodation ("RA") on May 7, 2021. (Doc. # 40-4 at 32). On May 11, 2021, Carolyn Rowls sent Plaintiff a memorandum on behalf of SSA explaining that additional medical documentation was required to show how Plaintiff's conditions related to her accommodation request. (*Id.*). The memorandum set a submission

deadline of June 10, 2021. (*Id*. at 33). On May 13, 2021, Susie Thompson, acting on Rowls's behalf, sent Plaintiff an amended request for supporting medical documentation, extending the deadline to June 12, 2021. (*Id*. at 36-37).

On July 12, 2021, Rowls sent Plaintiff another memorandum stating that the RA request remained pending. (Doc. # 40-5 at 7). The memorandum explained that, based on the medical documentation submitted, SSA determined the information was insufficient to establish Plaintiff as an employee with a disability. (*Id*.). Plaintiff was given an additional opportunity to submit medical documentation by August 12, 2021. (*Id*. at 9). However, Plaintiff resigned from her position on August 12, 2021. (Doc. # 35-11).

As to Plaintiff's first argument, Plaintiff has not presented, and the court cannot find, any evidence in the record that indicates SSA "refused" to transfer her back to the Birmingham office. Furthermore, it is undisputed that SSA engaged in the interactive process, and Plaintiff resigned before SSA had an opportunity to offer a reasonable accommodation. *See Dang v. Postmaster Gen.*, No. 25-10379, 2025 WL 3265344, at *6 (11th Cir. Nov. 24, 2025) (unpublished). Accordingly, SSA's alleged failure to accommodate cannot serve as the basis for her constructive discharge claim.

As to Plaintiff's second argument, the FMLA provides that an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period when a serious health condition requires that the employee be absent from work. 29 U.S.C. § 2612(a)(1). As the Eleventh Circuit has explained, the FMLA "provides for *only* 12 weeks of leave" and "does not suggest that the 12[-]week entitlement may be extended." *McGregor v. Autozone, Inc.*, 180 F.3d 1305, 1308 (11th Cir. 1999) (emphasis added). So, SSA was not required to give Plaintiff additional FMLA leave.

Additionally, while a "leave of absence might be a reasonable accommodation in some cases," *Wood v. Green*, 323 F.3d 1309, 1314 (11th Cir. 2003), "an accommodation is unreasonable if it would only allow an employee to 'work at some uncertain point in the future.'" *Billups v. Emerald Coast Utils. Auth.*, 714 F. App'x 929, 935 (11th Cir. 2017) (citing *Wood*, 323 F.3d at 1314). In this case, although Plaintiff's condition may improve at some point in the future, the court cannot say, on this record, that an additional leave of absence was a reasonable accommodation for Plaintiff's disability. *See Billups*, 714 F. App'x at 935-37 (explaining that, where Plaintiff's request for additional leave "was essentially an open-ended request for 'sufficient time to ameliorate his conditions'" following surgery, the requested leave was not a reasonable accommodation).

Finally, as to Plaintiff's third argument, "employee resignations are presumed to be voluntary." *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995) (citing *Angarita v. St. Louis Cnty.*, 981 F.2d 1537, 1544 (8th Cir. 1992); *Alvarado v. Picur*, 859 F.2d 448, 453 (7th Cir. 1988); *Christie v. United States*, 518 F.2d 584, 587 (1975)). "[R]esignations can be voluntary even where the only alternative to resignation is facing possible termination for [good] cause" because the employee had a choice. *Id.* (citing *Pitt v. United States*, 420 F.2d 1028 (1970)). Although Plaintiff faced potential termination, she had a choice to stay and go through the Proposed Removal process. Instead, Plaintiff chose to resign because she did not want the termination on her record. (Doc. # 35-11; Doc. # 35-1 at 89:15-24). Because Plaintiff's resignation was voluntary, she cannot establish a constructive discharge.

While constructive discharge qualifies as an adverse employment action, *Green*, 578 U.S. at 555, the court finds that Plaintiff was not constructively discharged from SSA. Thus, Plaintiff's

alleged constructive discharge cannot serve as the adverse employment action for her retaliation claim.

For all of the above reasons, Plaintiff has failed to establish that she suffered an adverse employment action under the Rehabilitation Act. And because Plaintiff did not suffer an adverse employment action, there can be no causal connection. *See Gupta*, 212 F.3d at 587. Accordingly, SSA's Motion for Summary Judgment is due to be granted as to Plaintiff's Rehabilitation Act Retaliation claim.

### 3. Plaintiff has not pointed to a similarly situated comparator

Plaintiff presents an alleged comparator to show circumstantial evidence of retaliation.[6] Although the court has already determined that Plaintiff did not suffer an adverse employment action and therefore cannot establish that any such action was motivated by illegal discrimination,[7] the court nevertheless addresses Plaintiff's alleged comparator.

In her response to SSA's Motion for Summary Judgment, Plaintiff argues that "other agency employees were granted more sick leave time [than Plaintiff] had been granted." (Doc. # 44 at 6). As the Eleventh Circuit has explained, "[a] 'similarly situated' comparator typically will have engaged in the same basic conduct (or misconduct); be subject to the same employment policy, guideline, or rule; have the same supervisor(s); or share the plaintiff's employment or

---

[6] A retaliation claim does not depend on comparing the plaintiff to other employees. Unlike discrimination claims, which ask whether an employee was treated worse than similarly situated coworkers, retaliation claims focus on whether the employer took adverse action because the employee engaged in protected activity. *Compare Lewis v. City of Union City*, 918 F.3d 1213, 1223 (11th Cir. 2019) (describing discrimination as a "comparative concept – it requires an assessment of whether 'like' (or instead different) people or things are being treated 'differently'"), *with Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318 (11th Cir. 2020) (explaining that comparators are not an element of a Title VII retaliation claim but plaintiffs "can attempt to establish" pretext using a comparator). Employees who do not complain or participate in protected activity are not similarly situated to those who do, so a meaningful comparator often does not exist.

[7] Because Plaintiff did not suffer an adverse employment action, there can be no discrimination. *See Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 941 (11th Cir. 2023) (explaining that the "ultimate question" is "whether there is enough evidence to show that the reason for an adverse employment action was illegal discrimination").

disciplinary history. *Jimenez*, 146 F.4th at 996 (citing *Lewis v. City of Union City*, 918 F.3d 1213, 1227–28 (11th Cir. 2019) (en banc)).

Alisha Taylor was a CSR at the Birmingham SSA Field Office when Plaintiff worked in Birmingham prior to her transfer to Talladega. (Doc. # 40-3 at 1). Allegedly, Taylor was on leave from SSA from a year or more following a surgery. (Doc. # 40-2 at 26-27). Like Plaintiff, Taylor received a Notice to Return to Duty. (Doc. # 40-3 at 25). After SSA issued the Notice to Return to Duty for Taylor, SSA began the process to remove her, but Taylor filed and was approved for DIB before she was terminated. (Doc. # 40-3 at 25). Plaintiff claims that "Taylor worked in the Birmingham office and was on leave for [fifteen] months before receiving the same letter that the Plaintiff received after being on leave for eight months." (Doc. # 44 at 11 ¶ 9).

Taylor cannot serve as Plaintiff's comparator. First, Taylor was not outside Plaintiff's protected class, as she too was on extended medical leave following surgery and ultimately left employment after applying for and receiving DIB. *See Jimenez*, 146 F.4th at 996. Second, Taylor and Plaintiff were not similarly situated in all material respects. *Id.* They worked at different SSA Field Offices, had different supervisors during their periods of extended leave, and were therefore subject to different decisionmakers. *See id.* Because Taylor was not "similarly situated [to Plaintiff] in all material respects," Plaintiff cannot rely on Taylor as a comparator. *Id.* To the extent a comparator would be helpful in a retaliation claim, one has not been established here.

### B.     FMLA Retaliation

The FMLA was enacted under two titles: Title I, generally governing private employees, and Title II, governing most federal employees. *See* 29 U.S.C. § 2611(2)(B)(i); 5 U.S.C. § 2105(a), § 6301; *Cavicchi v. Sec'y of Treasury*, No. 04-10451, 2004 WL 4917357, at *6 (11th Cir. Oct. 15, 2004) (unreported).

Sovereign immunity precludes a Title II federal employee from bringing suit under the FMLA. Courts in the Third, Fourth, Ninth, Tenth, and Eleventh Circuits have held there is no private cause of action for a federal employee under the FMLA. *See, e.g., Burg v. United States Dep't of Health & Human Servs.*, 387 F. App'x 237 (3d Cir. 2010) (unpublished); *Mann v. Haigh*, 120 F.3d 34, 37 (4th Cir. 1997); *Russell v. U.S. Dep't of the Army*, 191 F.3d 1016, 1019 (9th Cir. 1999); *Atkinson v. O'Neill*, 867 F.2d 589, 590 (10th Cir. 1989); *Schuman v. Perry*, No. 16–CV–313–JED–FHM, 2017 WL 2951918 (N.D. Okla. Jul. 10, 2017); *Cavicchi*, 2004 WL 4917357, at *6; *Souers v. Geren*, No. CV 108–157, 2010 WL 1169730 (S.D. Ga. Mar. 23, 2010); *Porterfield v. Berryhill*, No. 2:17-CV-00939-JEO, 2018 WL 2329771 (N.D. Ala. May 23, 2018). Nonetheless, the court addresses the merits of Plaintiff's FMLA retaliation claim.

To establish a prima facie case of retaliation under the FMLA, an employee must show "(1) that she engaged in statutorily protected conduct, (2) that she suffered an adverse employment action, and (3) that a causal connection exists between the two." *Tanner v. Stryker Corp. of Mich.*, 104 F.4th 1278, 1288 (11th Cir. 2024) (quoting *Batson v. Salvation Army*, 897 F.3d 1320, 1329 (11th Cir. 2018)). In the absence of direct evidence of retaliatory intent, the Eleventh Circuit applies the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Martin v. Brevard Cnty. Pub. Schs.*, 543 F.3d 1261, 1268 (11th Cir. 2008) (FMLA).

Under the *McDonnel Douglas* framework, once the employee establishes a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Tanner*, 104 F.4th at 1288-89. If the employer does so, the burden shifts back to the employee to show that the proffered reason is pretextual by presenting

17

evidence from which a reasonable factfinder could conclude that the employer's explanation was not the real reason for the decision. *Id.*

It is undisputed that Jones engaged in statutorily protected conduct by taking FMLA leave. But, as discussed above, neither the Notice to Return to Duty nor the Notice of Proposed Removal can be considered adverse employment actions. *See supra* Part IV.A.2.

Even if the Notice to Return to Duty or the Notice of Proposed Removal could be considered adverse employment actions, SSA has articulated legitimate, non-retaliatory reason for sending the notices. The Notice to Return to Duty explained that Plaintiff's absences had an adverse effect on SSA operations:

> Although your absences may have been for reasons beyond your control, your position is a vital one with SSA and is one that needs to be filled by an employee who is available for duty on a regular full-time or part-time basis. *Your absences have a detrimental effect on the office*, and at a minimum, cause management and your coworkers to be overburdened with completing your share of the workload. Your unavailability for duty creates delays and puts a strain on other staff members. Accordingly, it is critical that you return to work. *Indefinite continuation of LWOP does not promote the efficiency of the Federal service*.

(Doc. # 35-9 at 1) (emphasis added). The Notice of Proposed Removal contained a similar explanation, adding that it is essential for SSA employees to "report to duty as scheduled," and Plaintiff's "absence has a nexus to the efficiency of the service." (Doc. # 35-10 at 2). Further, the Notice of Proposed Removal specified that, in calculating Plaintiff's 934.25 hours of LWOP, Rowls did not include "the 480 of LWOP utilized under the Family Medical Leave Act (FMLA) from November 18, 2020 through March 9, 2021." (*Id.* at 1 n.1).

In response, Plaintiff argues that SSA's stated reasons were pretextual and that it intended all along to force Plaintiff to resign or be terminated, regardless of whether she received additional leave or returned to work. (Doc. # 44 at 8). In support, she points to staffing levels at the Talladega office and the fact that the agency issued the Notice of Proposed Removal just days before Plaintiff

was medically cleared to return. (*Id.*). However, Plaintiff cannot establish pretext merely by disagreeing with or second-guessing SSA's operational decisions. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) ("A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.") Here, Plaintiff offers no evidence that SSA's stated operational concerns were false. Instead, Plaintiff relies only on timing and generalized staffing observations, which are insufficient for a reasonable factfinder to conclude that SSA's stated reason was pretextual. *Tanner*, 104 F.4th at 1288-89.

Additionally, Plaintiff cannot show a causal link between the notices and exhaustion of her 480 hours of FMLA leave. To establish causation, an employee must show only that the protected activity and the adverse action are not entirely unrelated. *McAlpin v. Town of Sneads*, 61 F.4th 916, 931 (11th Cir. 2023) (quoting *Olmstead v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998)). The relevant period runs from the last day of FMLA leave to the occurrence of the adverse action. *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1272 (11th Cir. 2017). If temporal proximity is the only evidence of causation, the protected activity and adverse action must be "very close" in time. *McAlpin*, 61 F.4th at 932 (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)); *see also Davis v. Postmaster Gen.*, 550 F. App'x 777, 780-81 (11th Cir. 2013) (holding plaintiff failed to establish causation where employer terminated plaintiff about one month after any FMLA-protected leave would have expired).

Here, Plaintiff exhausted all 480 hours of FMLA leave on March 9, 2021. (Doc. #36 at 5). Plaintiff received the Notice to Return to Duty on April 23, 2021 approximately seven weeks later

and the Notice of Proposed Removal on August 5, 2021, nearly five months after her FMLA leave ended. (*Id*. at 7). The Eleventh Circuit has held that a three- to four-month gap is too long to establish causation, *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007), and that even a one-month gap may be insufficient, *Davis*, 550 F. App'x at 780-81. Because both the seven-week and five-month gaps exceed the timeframes recognized by the Eleventh Circuit, temporal proximity cannot establish causation in this case.

Moreover, the record shows that the notices were not based on Plaintiff's use of FMLA leave. The Notice to Return to Duty explicitly stated that "Management has not counted any time attributable to FMLA in its determination that your absences have continued beyond a reasonable period," and the Notice of Proposed Removal did "not include[] the 480 of LWOP utilized under the [FMLA]." Thus, even if the timing was sufficiently close, the notices were wholly unrelated to Plaintiff's FMLA leave. On this record, no reasonable factfinder could conclude that SSA's stated reason was not the real reason for its decision. *Tanner*, 104 F.4th at 1288-89.

For all of the above reasons, even if Plaintiff were allowed to prosecute an FMLA claim against the SSA, she cannot establish a prima facie case of retaliation under the FMLA.

## V.    Conclusion

Defendant's Motion for Summary Judgment (Doc. # 36) is due to be granted. A separate order will be entered.

**DONE** and **ORDERED** this February 3, 2026.

_____
**R. DAVID PROCTOR**
SENIOR U.S. DISTRICT JUDGE